UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANITA K. CAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:14 CV 772-DDN |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security, denying the application of plaintiff Anita K. Cain for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is reversed and remanded for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiff Anita Cain was born on July 27, 1967. (Tr. 7.) On October 26, 2011, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income under Title II and XVI of the Social Security Act. (Tr. 168-80.) Plaintiff alleged disability due to high blood pressure, kidney disease and depression, indicating an onset date of October 1, 2010. (Tr. 168, 175.) On March 2, 2012, plaintiff's claims for benefits were denied at the initial level. (Tr. 106.) On March 22, 2012, plaintiff filed a Request for Hearing by an ALJ, which was granted. (Tr. 113-17.) On June 14, 2013, the ALJ held the hearing, after which the ALJ determined that plaintiff was not disabled (Tr. 21-35.) Plaintiff requested review of the decision by the Appeals Council, which was denied. (Tr. 1, 20.) Plaintiff exhausted all of her administrative remedies; thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

### A. Medical Records

On October 17, 2010, plaintiff was transferred to Barnes Jewish Hospital from an outside hospital for treatment of a urinary tract infection (UTI). Plaintiff initially presented with abdominal pain, nausea, vomiting, painful urination and fever. A urinalysis confirmed UTI and a CT scan revealed that plaintiff had polycystic kidney disease, an inherited disorder in which cysts develop within the kidneys, and hepatic cysts, which are cysts of the liver. Plaintiff was treated with Dilaudid, a pain reliever, Zofran, which is used to prevent nausea and vomiting, and Unasyn, an antibiotic. (Tr. 446.)

At Barnes Jewish Hospital, plaintiff reported a medical history of hypertension and indicated that she was treating it with Norvasc 10. Plaintiff reported that she had been using alcohol heavily due to social stressors. She also indicated a history of UTI. Robert J. Mahoney, M.D., conducted an examination, which revealed that plaintiff had tenderness and pain in the area of the back overlying the kidney, and tenderness on the right and lower quadrants. (Tr. 446-47.) Plaintiff was diagnosed with UTI and was treated with ciprofloxacin, an antibiotic. She was also given intravenous fluids, acetaminophen, morphine and Zofran. Plaintiff was also treated with Lorazepam, which is used to treat anxiety, and given thiamine and folate multi-vitamins for her alcohol use. (Tr. 447.) She was also ordered to have a chemical dependency consultation and was given a nicotine patch. (Tr. 448.) On October 19, 2010, Plaintiff was discharged in good condition and was advised to schedule a follow-up visit with a Dr. Goldberg at the Wohl clinic. (Tr. 445.)

On October 5, 2011, plaintiff was admitted to Washington County Memorial Hospital because of lower abdomen and back pain and nausea. (Tr. 321.) Plaintiff indicated that she had increasing pain for approximately three to four weeks prior to the hospital visit. Plaintiff reported a medical and family history for polycystic kidneys and hypertension. (Tr. 328.) A CT scan revealed that plaintiff had cysts throughout her liver and both of her kidneys and a solid mass in the inferior pole of her right kidney. Plaintiff also had diverticulosis, which is a condition that develops when pouches form in the wall of the colon. (Tr. 336.) Richard Secor, D.O., diagnosed plaintiff with kidney infection, polycystic kidney disease and hypertension. Dr. Secor treated plaintiff with Levaquin, an antibiotic, Clonidine, for high blood pressure and Vicodin. (Tr. 329.) On October 7, 2011, Dr. Secor discharged plaintiff, with a diagnosis of UTI

and polycystic kidney disease. Dr. Secor noted that plaintiff was sitting up and eating, denied any nausea or pain and stated that she felt much better. Dr. Secor advised plaintiff to take Bactrim DS, an antibiotic, and Ultram, a pain reliever, for pain management. She was also encouraged to follow-up with a nephrologist for her kidneys. (Tr. 320.)

On November 21, 2011, plaintiff was admitted to Washington County Memorial Hospital with abdominal pain. Plaintiff was diagnosed with diverticulitis and polycystic kidney disease and was treated with Unasyn and Levaquin along with Percocet. Plaintiff responded to the treatment, and her diet and lab results returned to normal. On November 27, 2011, plaintiff was discharged with a diagnosis of diverticulitis, abdominal pain, anorexia and dehydration. (Tr. 292). At discharge, plaintiff's pain was manageable and signs of infection were lessened. (Tr. 293.) Additionally, plaintiff's dehydration was resolved with medical therapy. Plaintiff was advised to continue a bland diet and was prescribed Ambien, Percocet, Levaquin and Augmentin. (Tr. 292.)

On December 12, 2011, plaintiff presented at Resolutions Behavioral Health for a disability evaluation for the Missouri Department of Social Services with Patrick Oruwari, M.D. (Tr. 344-45.) Plaintiff indicated that she cries a lot and does not leave the house due to social anxiety. She denied any suicidal thoughts. She also reported nightmares, panic attacks, avoidant behavior and flashbacks to traumatic events. (Tr. 346.) Dr. Oruwari diagnosed plaintiff with post-traumatic stress disorder (PTSD) and social anxiety. He indicated by checking a box on the bottom of a form that the expected duration of plaintiff's disability would be 3 to 5 months. He also noted that plaintiff should get a further nephrology examination. (Tr. 345.)

On January 25, 2012, plaintiff consulted with Brian Gallagher, D.O., about a painful, enlarging lipoma, which is a slow-growing, fatty lump, on her back. Dr. Gallagher decided to excise the lipoma and prescribed Meloxicam, which is used to treat pain or inflammation caused by osteoarthritis or rheumatoid arthritis, Ambien, Ativan and Percocet, in preparation for the procedure. On February 16, 2012, Dr. Gallagher performed the excision without any complications. (Tr. 423-24, 454.)

On August 2, 2012, plaintiff consulted with Geetha Balasubramanian, M.D., a nephrologist, at Amin Nephrology & HTN Specialist for her polycystic kidney disease. (Tr. 483-85.) Dr. Balasubramanian assessed plaintiff for renal osteodystrophy, anemia, hypertension and vitamin D deficiency and ordered a full lab workup. He also ordered a full medical workup,

3

including a renal ultrasonogram, a magnetic resonance angiogram (MRA) of plaintiff's brain for her history of frequent headaches and family history of brain aneurysms, a renal panel, a urine analysis, a urine spot creatinine, a urine spot protein test, a Hepatitis B test, a Hepatitis C test and a protein electrophoresis. (Tr. 485.) Dr. Balasubramanian advised plaintiff to avoid all nonsteroidal anti-inflammatory drugs (NSAIDs) and other nephrotoxins. He also recommended plaintiff undergo a cardiology evaluation for her shortness of breath and a gastrointestinal (GI) evaluation for her recent history of vomiting blood. (Tr. 484.)

On August 29, 2012, plaintiff attended a follow up visit at Amin Nephrology & HTN Specialist with Mohammad Amin, M.D. (Tr. 486-88.) Plaintiff was diagnosed with stage II, or mild kidney disease. (Tr. 486.) Plaintiff's workup for renal insufficiency was negative. Plaintiff's other lab work was also unremarkable. Plaintiff's blood pressure was acceptable based on her current regimen. Lastly, Dr. Amin treated plaintiff for a UTI by prescribing her with Cipro, an antibiotic. Dr. Amin recommended further cardiology and GI examinations and ordered plaintiff to follow up at the clinic in one year. (Tr. 486-87.)

From January 10, 2012 to October 8, 2012, plaintiff visited primary healthcare physician, James Hawk, M.D., for various ailments, including lower back pain, anxiety, flu, UTIs and hypertension. Dr. Hawk treated her with various prescriptions and referred her to specialists. (Tr. 489-98.)

On October 4, 2012, plaintiff was seen at Washington University School of Medicine, Department of Internal Medicine by Seth Goldberg, M.D., for an evaluation of her polycystic kidney disease. (Tr. 599-601.) Dr. Goldberg determined that plaintiff had stage I chronic kidney disease secondary to autosomal dominant polycystic kidney disease. He advised plaintiff to reduce caffeine intake. He also determined that plaintiff had an UTI which caused dysuria and flank pain. He prescribed her antibiotics. Dr. Goldberg also determined that plaintiff's blood pressure was near target range and advised her to follow-up in six months. (Tr. 600-01.)

From June 7, 2012 to January 31, 2013, plaintiff consulted with George M. Gasser, D.O., at Washington County Memorial Hospital for pelvic pain, uterine fibroids and polycystic kidney disease. (Tr. 604-12, 640-52.) Dr. Gasser noted plaintiff had a soft abdomen with tenderness. (Tr. 612.) Dr. Gasser determined that plaintiff would need a hysterectomy and referred her to Dr. Amin for pre-operative clearance. (Tr. 504-07, 537-39, 611-12.) After receiving pre-operation clearance, on December 15, 2012, plaintiff was admitted to Parkland Health Center for

her surgery. (Tr. 510-12.) On December 19, 2012, plaintiff's surgery was cancelled due to plaintiff's poor pulmonary status and low potassium levels. (Tr. 516.) Dr. Gasser suggested plaintiff see a pulmonologist for her pulmonary status. (Tr. 516-17.)

On August 20, 2012, September 18, 2012, October 22, 2012 and April 2, 2013, plaintiff visited Resolutions Behavioral Health for follow-up visits with Dr. Oruwari for depression and anxiety, which he treated with prescriptions. (Tr. 581-91.) Plaintiff presented with anxiety and depressed mood. (Tr. 581.) On April 2, 2013, plaintiff did not present with any signs of psychosis and mania. She was assessed with major depressive affective disorder, improved obsessive-compulsive disorder and chronic post-traumatic stress disorder. She was assigned a GAF[1] score of 55.[2] Dr. Oruwari believed that plaintiff's symptoms were a result of her access to health care and social environment. (Tr. 584.) Dr. Oruwari continued plaintiff on her prescriptions and added Mirtazapine to help with her mood, improve appetite and help with her sleep. (Tr. 585.) He ordered plaintiff to start on her new medication, return to the office if symptoms persisted, continue with pain management and increase her social interaction. Plaintiff was scheduled for a follow-up visit in 3 months. (Tr. 585-86.)

### B. ALJ Hearing

On June 3, 2013, plaintiff appeared with her counsel and testified to the following at a hearing before an ALJ. Plaintiff is unemployed and lives with her daughter, Mindy Cain and her two grandchildren, then ages four and one. Plaintiff does not provide childcare for her grandchildren. Plaintiff has an eleventh grade education, and does not have a GED. Plaintiff receives Medicaid, $163 in food stamps and $271 in pension funds from a fiancé who passed away from cancer. Plaintiff does not drive because she does not have a current driver's license and did not renew it after receiving a DWI. Plaintiff also does not drive because she suffers from panic attacks and feels uncomfortable when driving. (Tr. 46-48.)

---

[1] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM IV").

[2] A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM IV at 34.

Plaintiff testified that she previously worked as a nurses' assistant and during the last fifteen years, as a home health aide. Plaintiff believes that there was no difference between a nurses' assistant and a home health aide, except that the former works in a facility and the latter in a home. Plaintiff worked full-time as a nurses' assistant eleven and half years ago and worked as a home health aide for four months. As a nurses' assistant, the most plaintiff lifted was 200 pounds with assistance. Without assistance, she was able to lift about 100 pounds. Plaintiff left her work as a nurses' assistant to take care of her fiancé who was dying from cancer and because of her worsening back problems. (Tr. 48-49.)

Plaintiff estimated that she stopped working full-time around March 2010. (Tr. 49.) Plaintiff testified that the serious conditions that prevent her from working are depression, pain and anxiety. She cannot be around a "bunch" of people, by which she means more than ten. She suffers from "back flashes" about her father molesting her, which started around three or four years ago. She had previously blocked her memories and did not tell anybody about the molestations, until her sister told somebody. (Tr. 50.)

Plaintiff takes medication for her anxiety, which has helped her a little. She also takes medication for her depression, but feels that her current medication does not help her because she has continued crying. She believes that she may need a new prescription. Plaintiff plans to talk to her doctor about switching her depression medication the next time she goes to the office. Plaintiff sees a psychiatrist every two months and has been seeing him for the past few years. Plaintiff also sees a therapist and will continue to see her once a week, when her therapist returns from vacation. (Tr. 50-52.)

Plaintiff experiences pain in her back, side, stomach and shoulder. Plaintiff believes her shoulder pain is a result of lifting for many years. After taking her pain medication, plaintiff feels that her pain is a five on a scale from one to ten. Without medication, plaintiff feels that her pain is a twenty on the same scale. Plaintiff has difficulty sleeping and takes several sleeping medications. Even with medication, plaintiff wakes up with nightmares and "back flashes" about three or four times a week. After she wakes up from her nightmares, she does not go back to sleep. (Tr. 51-52.)

On a typical day, plaintiff wakes up around ten or eleven in the morning, uses the bathroom and then goes to the kitchen to get a glass of tea. She goes back to her room and takes her medications. She then lies in bed for up to eighteen hours a day and thinks. Plaintiff does

not watch television or read books while lying in bed. When plaintiff needs to go shopping or go to her doctor's appointments, she goes with her daughter who drives her. Plaintiff occasionally misses her doctor's appointments because nightmares will keep her awake at night and she sleeps through the appointment. Plaintiff only eats when her daughter cooks and reminds her to eat. Plaintiff's daughter cooks all of her meals. Plaintiff testified that she lost about forty pounds since July 2012 because of her medical issues. (Tr. 53-54.)

Plaintiff does not do any housekeeping or laundry, as her daughter does all of the household work. Plaintiff's daughter helps her get in and out of the shower because plaintiff has fallen several times. Plaintiff received a knot on her head and bruises on her legs from falling in the shower in the past, but did not seek medical attention for her injuries. (Tr. 55.)

Plaintiff experienced abdominal pain since June 2012. Plaintiff likened the pain to being stabbed by a knife. Plaintiff's doctors told her that she needs a hysterectomy, but they have refused to do the surgery because her lungs may collapse and because of the risk of a heart attack, due to her low potassium levels. Plaintiff had taken potassium six times a day, up until the day before the scheduled surgery; however, her potassium levels were still too low. Her doctors also referred her to Barnes Jewish Hospital, but the hospital declined to complete the surgery. Her doctors plan to send her to different doctors and hospitals to see if anyone will do to the surgery, but so far no one has agreed. (Tr. 56-57.)

Plaintiff testified that her cysts, due to kidney disease and diverticulitis, are so big that they are pushing against her organs. Without the surgery, her pain will continue and get worse. Plaintiff's cysts also burst, and she can tell that they do because the pain will cause her to get on her knees and cry. Plaintiff also has high blood pressure, which she is currently medicating with Atenolol. Her blood pressure runs about 146/106 and the last time it bottomed out was three weeks ago, when one of her cysts burst. (Tr. 56-57.)

Plaintiff quit smoking in June 2011. Plaintiff does not experience any side effects from her medications. Plaintiff can walk for about a block and a half and stand for ten to fifteen minutes at a time. Plaintiff never stoops, kneels, crouches or crawls; however, she can stoop and lean forward slightly when she has to lift something. When plaintiff puts on her pants or socks, she sits on her bed and pulls her leg up. Plaintiff does not have any problems using her hands. (Tr. 58-59.)

7

On April 8, 2012, plaintiff was involved in a car accident twenty miles from her home. She was in the passenger's seat and did not have a seat belt on. Plaintiff hit her head on the windshield. Plaintiff suffered from neck pain after the accident, but it abated. Plaintiff still suffers from shoulder pain. After the accident, plaintiff's daughter indicated that plaintiff repeats herself a lot, possibly due to head injuries. (Tr. 59-60.)

Plaintiff does not lift over five pounds, a limit given to her by her family physician, Dr. James Hawk. She has difficulty lifting a gallon of tea out of the fridge. Plaintiff can sit for about fifteen minutes until she begins to feels pain in her lower back. Plaintiff does not feel comfortable around more than ten people, including family members, and would likely have problems around fewer than ten. (Tr. 61-62.)

Plaintiff experiences kidney "flare-ups," which occur when one of her kidney cysts burst. The flare-ups occurred six times within the last couple of weeks, and they last about three days. When they occur, she drains out "black stuff" and experiences a lot of pain. She does not seek medical help because doctors cannot help her, but calls her family physician, who usually advises her to lie down and rest. (Tr. 62-63.)

Plaintiff lives on the first floor of her apartment building and uses the front entrance, which is flat, as opposed to the back door which has fifteen steps. Plaintiff does not shower every day because she needs her daughter's assistance. Plaintiff does not get dressed, unless she has a doctor's appointment. She goes to the store once a month, and sometimes tells her daughter what to get out of her food stamps. She does not feel comfortable in the store because there are too many people and she feels that they are all looking and talking about her. When physically near people, she sweats and gets red-faced, which lasts around thirty minutes to an hour. Plaintiff cries every night until she falls asleep, which can take up to thirty minutes. Plaintiff is sober and the last time she drank alcohol was July 27, 2012. While plaintiff does not remember this, plaintiff's daughter told her that they got into a fight, which prompted her to get sober. (Tr. 63-66.)

Plaintiff has difficulty remembering to take her medication every day, and her daughter has to remind her. Her daughter sets up her medication in a box. She does not leave her house, except for doctor's appointments and shopping trips. At times, plaintiff's daughter has to force her out of bed to go to doctor's appointments. (Tr. 66-67.)

Plaintiff suffers from flashbacks to her childhood. While she blocked out parts of her memory, she remembers that she was molested when she was seven or nine years old and that her brother and mother were shot. While she remembers her teenage years and parts of her childhood, she blocked the rest out. (Tr. 67-68.)

Plaintiff's depression and anxiety levels are the same when she is sober or when she is drinking. Her physical pain is worse when she is sober. Plaintiff uses a nebulizer for her chronic obstructive pulmonary disease two to three times a day, even though she is supposed to use it four to six times a day. She forgets to use it if her daughter doesn't remind her. When she has trouble breathing, she uses her inhaler. (Tr. 67-69.)

Vocational Expert Leanne Bloom (VE) also testified at the hearing. The ALJ asked her several questions about the employability of three hypothetical persons with the same age, education, and work history as plaintiff, plus the following Residual Functional Capacity (RFC) to perform light exertion work involving simple, repetitive duties, but with the following limitations: no work on ladders, ropes, or scaffolds; no work at unprotected heights; only occasional stooping, kneeling, crouching, and crawling; and limited environmental irritants. The VE testified that with these conditions, plaintiff could not perform her past work as a nurse's assistant. But, the VE testified, such a person could perform the work of an assembler, inspector, and hand packager. (Tr. 71.)

The second hypothetical question presented a person who could perform only sedentary work. The VE testified that this person could perform the duties of a sorter, an assembler, and a bench packager. (Id.)

The third question asked the VE to modify the second hypothetical person by limiting her to occasional interaction with coworkers, supervisors, and the general public. The VE testified that such a person could perform the same work as the subject of question two, but that the numbers of such positions would be reduced by 15%. (Tr. 72.)

### III. DECISION OF THE ALJ

On June 14, 2013, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 24-35.) The ALJ first determined that the plaintiff met the insured status requirements of the Social Security Act through September 30, 2015. The ALJ then found that the claimant had not engaged in substantial gainful activity since October 1, 2010, the alleged onset date. The ALJ found that plaintiff's polycystic kidney disease, chronic obstructive pulmonary disease (COPD),

anxiety, PTSD and depression were severe impairments. The ALJ also determined that plaintiff's diverticulitis and hypertension were non-severe because they did not pose more than a minimal impact on the plaintiff's ability to perform work activity. (Tr. 26-27.)

The ALJ also found that plaintiff had moderate difficulties with concentration, persistence or pace. She found support for this finding in plaintiff's testimony that she does not read for pleasure, she does not watch much television, she has trouble remembering to take her medication, and she has problems paying attention and following written instruction. However, she does better with spoken instruction. (Tr. 28.)

The ALJ determined that, while plaintiff had impairments that were severe, plaintiff did not present credible evidence to show that she had an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Thus, a finding of disability could not be established on the medical facts alone. (Tr. 27.)

After considering the entire record, the ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work, with the exception that plaintiff cannot climb ladders, ropes, or scaffolding, though she may occasionally stoop, kneel crouch and/or crawl. Plaintiff must avoid all exposure to unprotected heights and must avoid concentrated exposure to poorly ventilated areas and environmental irritants. Additionally, plaintiff is limited to simple, routine and repetitive work, with only occasional interaction with the public, coworkers and supervisors. (Tr. 29.) The ALJ concluded that given the record as a whole, the plaintiff could perform a reduced range of light work. (Tr. 33.) The ALJ also determined that plaintiff was unable to perform her past relevant work as a nurses' assistant. (Tr. 34.) Considering the testimony of the vocational expert (VE), plaintiff's education, work experience and RFC, the ALJ found that plaintiff was capable of making adjustments to other work that existed in the national economy, including assembler, inspector and hand packager. (Tr. 35.)

Accordingly, the ALJ found that plaintiff was not disabled under the Social Security Act from October 1, 2010 to the date of the decision. (Id.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are

supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. To determine whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. A court may not reverse a decision merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

In determining disability, the ALJ uses a five-step regulatory framework. 20 C.F.R. § 416.920(a)(4); Pate-Fires, 564 F.3d at 942. For the first four steps, the burden is on the claimant to prove disability, and if the claimant is successful at each of the first four steps, the burden shifts to the Commissioner at Step Five. Pate-Fires, 564 F.3d at 942.

First, the claimant must prove that she is not currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). Second, the claimant must prove that she suffers from a severe impairment that significantly limits her physical or mental ability to do basic activities. 20 C.F.R. § 416.920(a)(4)(ii). Third, the claimant must show that her condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. In Step Four, the ALJ must consider whether the claimant retains the RFC to perform past relevant work (PRW). 20 C.F.R. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff presents two arguments appealing the ALJ's determination that plaintiff was not disabled. First, plaintiff argues that the ALJ erred in assessing the plaintiff's residual functional capacity (RFC) because she failed to include a concentration, persistence or pace element in determining which jobs plaintiff could perform. Despite testimony, medical evidence and the ALJ's own determination that plaintiff had moderate difficulties in concentration, persistence or

pace due to depression and anxiety, the ALJ posed hypothetical questions to the Vocational Expert (VE), that only included limits to simple, repetitive tasks and limited social interaction, and did not sufficiently include a moderate concentration, persistence or pace limitation.

Second, plaintiff argues that the ALJ erred because she improperly discounted the opinions of plaintiff's treating physicians, Dr. James Hawk and Dr. Patrick Oruwari, when she failed to provide reasons comporting with the criteria set forth in 20 C.F.R. § 404.1527(d)(2), for why she gave little weight to their medical opinions.

The court agrees that the ALJ failed to focus the questions she posed to the VE to properly include a concentration, persistence or pace element and that the ALJ improperly discounted the opinions of plaintiff's treating physician Dr. Oruwari, but not those of Dr. Hawk.

**A. Residual Functional Capacity and Hypotheticals Posed to the Vocational Expert**

An ALJ's determination of a plaintiff's RFC is a medical question and must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is defined as what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions and a claimant's description of her limitations. 20 C.F.R. §§ 404.1545, 416.945(a); Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. The ALJ must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence, including daily activities and observations. SSR 96-8p, 1996 WL 374184, at *7 (1996). While the ALJ bears the primary responsibility for determining a claimant's RFC, the claimant bears the burden of proving disability and demonstrating RFC. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).

An ALJ may rely on a VE's response to a properly formed hypothetical question to show that the jobs that a person with the plaintiff's RFC could perform exist in significant numbers. Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005). A VE's testimony based on a hypothetical question that does not encompass all the relevant parts of a claimant's impairments cannot constitute substantial evidence to support an ALJ's decision. Renstrom v. Astrue, 680

F.3d 1057, 1067 (8th Cir. 2012). While the hypothetical question does not have to contain a description of the claimant's impairments in diagnostic terms, it must include the concrete consequences of the claimant's impairments. <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006). An ALJ cannot pose generalized questions that contain assumptions that the claimant has the ability to perform a certain category of work. <u>Guilliams</u>, 393 F.3d at 804.

In this case, the ALJ's decision is not supported by substantial evidence on the record, because the hypothetical questions she posed to the VE did not direct the VE to consider all of plaintiff's limitations in concentration, persistence or pace in determining which jobs existed in the economy that plaintiff could perform. The ALJ herself determined that plaintiff had moderate limitations in concentration, persistence and pace. (Tr. 28.) However, these limitations were not included in the hypothetical questions that the ALJ posed to the VE. The ALJ posed questions to the VE that contained limitations to "simple" and "repetitive" work, with additional limitations regarding plaintiff's restricted contact with the public and co-workers. (Tr. 70, 72.) The "simple" and "repetitive" language failed to capture all of plaintiff's moderate difficulties in concentration, persistence or pace, despite the ALJ's own finding that plaintiff suffered from these limitations. (Tr. 28.)

While the ALJ does not have to use exact, diagnostic terms to frame a hypothetical question, the ALJ must include the consequences of the claimant's impairments. <u>Lacroix</u>, 465 F.3d at 889. Here, the ALJ did not have to use exact diagnostic language, but her hypothetical questions were required to include the consequences of the plaintiff's moderate impairments in concentration, persistence and pace, which the ALJ found existed, so that the VE could base her opinion on the full extent of plaintiff's limitations. The ALJ's use of "simple" and "repetitive" language failed to capture the consequences, as is illustrated by the jobs that were elicited from the VE by the ALJ's questioning. Based on the ALJ's questions, the three jobs that the VE identified as available to plaintiff in the national and local economy were assembler, inspector and hand packager. (Tr. 34-35, 70-71.) According to the United States Department of Labor's <u>Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles</u>, these occupations require the individual to be able to perform repetitive work, according to set procedure, sequence or pace. United States Department of Labor, <u>Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles</u> 284, 315, 318 (1993). Thus, an individual, even when performing simple and repetitive jobs, may be required to have a

persistence or pace element. In this case, the ALJ posed questions using "simple" and "repetitive" language, which elicited jobs from the VE requiring such a persistence or pace element. (Tr. 70-71). Instead, the ALJ should have posed questions to the VE including plaintiff's moderate limitations in concentration, persistence or pace, such that the VE was oriented to plaintiff's specific situation. Since the ALJ determined the plaintiff's RFC based on hypothetical questions posed to the VE that did not orient the VE to all of plaintiff's limitations, the RFC finding is not supported by substantial evidence.

In her brief, plaintiff relies on a Seventh Circuit case, O'Connor-Spinner v. Astrue, which held that the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical questions posed to VEs to focus the VEs' attention on these limitations and assure reviewing courts that the VEs' testimony constitutes substantial evidence of the jobs that a claimant can do. O'Connor-Spinner v. Astrue, 627 F.3d 614, 621 (7th Cir. 2010). While the plaintiff does rely on a Seventh Circuit case, which is not binding precedent here, the plaintiff also draws on Eighth Circuit cases that hold that questions posed to a VE must capture all of plaintiff's limitations so that the VE can accurately assess whether jobs exist in the economy. Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996) (hypothetical question posed by ALJ was deficient because it omitted medical evidence of plaintiff's deficiencies in concentration, persistence or pace); Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994) (hypothetical question to VE must precisely describe a claimant's impairments so that the expert may accurately assess whether jobs exist for the claimant); Whitmore v. Bowen, 785 F.2d 262, 263 (8th Cir. 1986) (a VE's testimony based on insufficient hypothetical questions may not constitute substantial evidence to support a finding of no disability). Moreover, this court has held that hypothetical questions posed to the VE must contain all of plaintiff's limitations. See Leeper v. Colvin, No. 4:13-CV-367-ACL, 2014 WL 4713280 (E.D. Mo. Sept. 22, 2014) (holding that hypothetical questions posed to the VE must include all of plaintiff's limitations, such that VE may accurately determine plaintiff's ability to work); Logan-Wilson v. Colvin, No. 4:13-CV-1119-JAR, 2014 WL 4681459 (E.D. Mo. Sept. 19, 2014) (holding that the ALJ did not properly account for plaintiff's pace difficulties in the RFC).

Therefore, the ALJ did not account for all of plaintiff's limitations in concentration, persistence and pace in the hypotheticals that she posed to the VE, such that the VE could not properly determine plaintiff's ability to work in jobs available in the economy. The ALJ relied on

14

this testimony to determine plaintiff's RFC. Thus, the ALJ's RFC determination is not supported by substantial evidence. The court orders remand for consideration on this matter.

### B. Treating Physician Evidence

A treating physician's opinion should not ordinarily be disregarded and is entitled to consideration for substantial weight. Singh, 222 F.3d at 452. A treating physician's opinion regarding a claimant's impairments should be given controlling weight, if the opinion is well-supported by medically acceptable diagnostic techniques and is not inconsistent with substantial evidence in the record. Id. A treating physician's opinion may be disregarded in favor of other opinions if it is not supported by the record. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence or if the treating physician has offered inconsistent opinions); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement). Moreover, an ALJ may appropriately rely on non-examining opinions as part of her RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935 (8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id. at 936 (ALJ's task is to resolve conflicts in the evidence).

Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must always give good reason for the particular weight given. See 20 C.F.R. § 404.1527(d)(2). The ALJ must provide principled reasons to reject a medical source opinion. Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005). Whether or not the ALJ gives substantial or less weight to a treating physician's opinion, the ALJ must provide good reasons for giving the opinion that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). Under the regulations, unless a treating physician's opinion is granted controlling weight, the medical opinions of record must be evaluated using the following factors: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency of the opinion, (5) specialization of the medical source and (6) other factors brought to the Agency's attention. 20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ improperly discounted the medical opinions of plaintiff's treating physician, Dr. James Hawk, because she failed to evaluate his opinions using the factors of 20 C.F.R. § 416.927(c)(1)-(6), other than his specialty. The court disagrees. Here, the ALJ afforded Dr. Hawk's medical opinions on plaintiff's mental impairments little weight (Tr. 33) and so the ALJ was required to evaluate the medical record using the six factors of 20 C.F.R. § 416.927(c)(1)-(6). See 20 C.F.R. § 404.1527(d)(2). The ALJ properly considered that Dr. Hawk was not a psychologist or psychiatrist, and the record indicates that Dr. Hawk was a family physician. (Tr. 33, 61.) In evaluating a physician's opinion, an ALJ should consider the physician's medical specialty and Dr. Hawk was not a psychiatrist or psychologist trained in mental evaluations. See 20 C.F.R. § 404.1527(c)(5), 416.927(c)(5)

Additionally, the ALJ considered that Dr. Hawk's medical opinions regarding plaintiff's mental impairments relied primarily on plaintiff's subjective reports of symptoms and limitations, without any critical examination for their truth. (Tr. 33.) The ALJ also considered that plaintiff's subjective reports regarding her mental impairments and the degree of her limitations and determined that they were not credible and not supported by the medical records.[3] See McCoy v. Astrue, 648 F.3d 605, 616-17 (8th Cir. 2011) (a physician's report is rendered less credible because his evaluation was based, in part on the claimant's less than credible self-reported symptoms). Here, the ALJ properly factored in that Dr. Hawk's medical opinions on plaintiff's impairments were based on plaintiff's less than credible subjective reports and determined that his medical opinions were rendered less than credible.

The ALJ also considered Dr. Hawk's treatment of plaintiff's mental impairments. The ALJ determined that while Dr. Hawk had been treating plaintiff's psychiatric issues with psychotropic medications, his treatment records lacked any formal psychiatric evaluations, testing or medical signs of laboratory findings. (Tr. 33.) Thus, Dr. Hawk failed to support his medical opinions on plaintiff's mental limitations with medical evidence. This comported with the regulations, which provide that the ALJ should consider the treatment the physician has provided and the kinds of examinations the source has performed and that more weight will be given to an opinion when medical source presents relevant evidence, such as medical signs, in

---

[3] The ALJ determined that plaintiff's subjective complaints were not credible because they were inconsistent with the record as a whole. (Tr. 29-33.) The ALJ's consideration of the subjective aspects of plaintiff's complaints comported with the regulations in 20 C.F.R. §§ 404.1529, 416.929, and the framework set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

support of opinion. See 20 C.F.R §§ 404.1527(c)(2), 416.927(c)(2), 404.1527(c)(3), 416.927(c)(3). Overall, the ALJ provided valid reasons for giving Dr. Hawk's medical opinion little weight.

Plaintiff additionally argues that the ALJ improperly discounted the medical opinions of plaintiff's psychiatrist, Dr. Patrick Oruwari, because she failed to provide reasons for discounting his medical opinions about plaintiff's mental limitations. On this point, the court agrees.

The regulations and case law of this Circuit require that an ALJ provide principled reasons for discounting a treating physician's opinion. Here, the ALJ did not provide any such reasons. The ALJ mentions the psychiatrist once, when she states "[T]he claimant reportedly treats anxiety and depression with 'Dr. Oh'." (Tr. 29.) The ALJ does not provide reasons for why she discounted Dr. Oruwari's opinions, a required by 20 C.F.R. § 404.1527(d)(2).

In this Circuit, there are cases that support the position that an ALJ is not required to explicitly discuss each piece of evidence, even if it was considered in the ultimate decision. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (an ALJ is not required to discuss every piece of evidence she considers in her decision). For example, in Hausmann v. Astrue, which defendant cites, the court found that the ALJ was not required to explicitly discuss each piece of evidence in the ALJ's decision to discount a treating physician's opinion. Hausmann v. Astrue, No. 4:06-CV-1620-CEJ, 2008 WL 783277 at *17 (E.D. Mo. Mar. 20, 2008). However, the facts in that case are distinct from the case here, because the ALJ did specifically refer to and discuss the reasons for discounting the treating physician's opinion, even if the ALJ did not explicitly discuss every single piece of evidence. Here, the ALJ failed to discuss any reason for discounting Dr. Oruwari's opinion.

Thus, the ALJ failed to properly discuss reasons why she discounted Dr. Oruwari's opinion and the court orders remand for explicit consideration of this matter.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and this case is remanded to the Commissioner for further proceedings consistent with this opinion. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 5, 2015.